**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

CONTINENTAL CASUALTY COMPANY                                              PLAINTIFF

v.                                          No. 4:05CV00979 JLH

BOBBY KEITH MOSER; MOSER &
ASSOCIATES, P.A.; BARRY JEWELL;
JEWELL LAW FIRM, P.A.; and
BOB BOMAR as an interested party                                          DEFENDANTS

**OPINION AND ORDER**

This diversity case presents a dispute as to whether a professional liability policy provides coverage for an action filed by Bob Bomar against his former attorneys, Bobby Keith Moser and Barry Jewell, in the Circuit Court of Pulaski County, Arkansas. Continental Casualty Company commenced this action seeking a declaratory judgment that it has no duty to defend or indemnify Bobby Keith Moser, Moser & Associates, P.A., Barry Jewell, or Jewell Law Firm, P.A., under the terms of two lawyers professional liability policies.[1] Continental has filed a motion for summary judgment. Barry Jewell and Jewell Law Firm, P.A., have responded. The other defendants have filed no response to the motion for summary judgment. For the following reasons, Continental's motion is granted.

**I.**

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[1] One policy was issued to Moser and Associates, P.A., the other to Jewell Law Firm, P.A. They are both claims made and reported policies effective from September 1, 2003, to September 1, 2004. The provisions of the two policies relevant to this case are identical.

matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis of its motion and identifying the portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 763 (8th Cir. 2003). When the moving party has carried its burden under Rule 56(c), the non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1985) (quoting FED. R. CIV. P. 56(e)). The non-moving party sustains this burden by showing that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a non-moving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

Local Rule 56.1 provides that a party moving for summary judgment must file a statement of material facts as to which it contends there is no genuine issue to be tried. All material facts set forth in this statement filed are deemed admitted unless controverted in a statement of material facts filed by the non-moving party. *Id.* In accordance with this rule, Continental filed a statement of material facts along with its motion for summary judgment. Although Jewell and Jewell Law Firm, P.A., responded to the motion for summary judgment, they did not file a statement of facts controverting those set forth by Continental. As noted

above, the other defendants have filed no response to the motion for summary judgment. Because none of the defendants has controverted Continental's statement of undisputed facts, those facts are deemed admitted.

## II.

In or around 1989, Bomar sought legal representation from Jewell in connection with a business called Scanning Technologies, Inc., which Bomar had founded. About four years later, Jewell informed Bomar that Moser, who was then Jewell's law partner, knew of a client who was interested in purchasing an interest in Scanning Technologies.

Bomar owned 49% of Scanning Technologies's stock. At that time, the remaining 51% of the stock was owned by three other individuals. Jewell and Moser prepared documents effectuating transfers in which Scanning Technologies exchanged all voting common stock held by the other three stockholders for non-voting preferred stock and issued new voting common stock to an entity called EAB Enterprises. As a result of these transactions, EAB became the owner of 51% of the voting stock. Moser and Jewell also prepared documents in connection with Scanning Technologies's receipt of a $400,000 loan from an entity called FBN Investments.

Jewell and Moser told Bomar that a woman named Fran Post was the president of both FBN and EAB and that she was directing the investments and activities of those companies. Post's signature purportedly appears on the documents formalizing the loan from FBN to Scanning Technologies, and a place for her signature appears on the documents effectuating EAB's stock purchase in Scanning Technologies.

Post, a resident of Jackson Hole, Wyoming, has testified that she was not involved in setting up EAB or FBN and that she never consented to serve, or knew that she was serving, as

either company's president.  Post further testified that Moser asked her to pick up mail for FBN and EAB in Jackson Hole and to forward that mail, unopened, to the Jewell and Moser law firm. Post was not involved in the business of FBN or EAB, never directed either companies' activities, and never invested any money in either company.

After EAB purportedly purchased the majority interest in Scanning Technologies, Post and Jewell were named directors of Scanning Technologies.  Scanning Technologies's board of directors was then comprised of Jewell, Post, and Bomar.  Bomar never met Post, however, and at one point asked Jewell if Post was a real person.  Post has testified that she knew nothing about Scanning Technologies and never consented to serve, or knew that she was serving, as a director of the company.

Bomar served as president of Scanning Technologies, as well as a director, both before and after the transactions involving FBN and EAB.  Before the transfer of Scanning Technologies's stock to EAB, Bomar and other shareholders had been responsible for Scanning Technologies's accounting.  After the stock transfer, however, Jewell and Moser told Bomar that their clients, FBN and EAB, wanted the Jewell and Moser law firm to take control of Scanning Technologies's finances.  Jewell and Moser then took over responsibility for the corporation's finances, and in 1998 their law firm began financing Scanning Technologies's operations. Thereafter, Jewell and Moser provided Bomar with very little information about Scanning Technologies's financial affairs.  Jewell and Moser also began unilaterally determining Bomar's compensation and removed his name from the signature card at Scanning Technologies's bank.

In 1996 or 1997, Bomar informed Jewell and Moser that he wanted to sell Scanning Technologies.  Several individuals and entities had expressed an interest in purchasing all or part

4

of the corporation. Jewell and Moser insisted on negotiating any sale of Scanning Technologies, purportedly on behalf of their clients FBN and EAB. On April 27, 1999, Jewell wrote a letter to a potential purchaser stating, "our law firm has been financing the operations of Scanning Technologies, Inc., since January of 1998." The letter stated how much Scanning Technologies owed to Jewell and Moser and how a prospective purchaser could satisfy that debt. The letter demanded that "all offers, financial questions, and negotiations should be directed to [Jewell's] attention." (Emphasis in the original.) Bomar alleges that Jewell and Moser intentionally blocked the sale of Scanning Technologies to prospective buyers because they wanted to continue using Scanning Technologies for illegal money laundering activities. Scanning Technologies was never sold and eventually went out of business.

   FBI investigators interviewed Bomar about Jewell and Moser in 2002. Moser later pleaded guilty to defrauding eight victims by improperly withdrawing money from his law firm's client trust account and secretly investing those funds in Scanning Technologies.

   Bomar filed suit against Jewell and Moser. His second amended complaint includes counts for breach of fiduciary duty, negligence, and fraud, as well as a RICO count. Continental asserts that it has no duty to defend or indemnify Jewell, Moser, and their law firms because five provisions in the liability policies issued to Jewell and Moser unambiguously bar coverage for Bomar's claims: section I.A.3, which excludes coverage for acts or omissions that the insured knew before the inception of the policy might give rise to a claim; section IV.A, which excludes coverage for a claim arising out of a dishonest or fraudulent act; section IV.F, which excludes coverage for a claim arising out of an insured's capacity as a director or manager of a business enterprise; section IV.H, which excludes coverage for a claim for legal services performed for an

entity controlled by or managed by an insured; and section V.H, which obligates the insured to cooperate in the defense.

### III.

"In Arkansas, insurance policies are to be interpreted like other contracts." *Foster v. Farm Bureau Mut. Ins. Co.*, 71 Ark. App. 132, 133, 27 S.W.3d 464, 465 (2000) (citing *Agric. Ins. Co. v. Ark. Power & Light Co.*, 235 Ark. 445, 361 S.W.2d 6 (1962)). "The language in an insurance policy is to be construed in its plain, ordinary and popular sense." *Tri-State Ins. Co. v. Sing*, 41 Ark. App. 142, 145, 850 S.W.2d 6, 8 (1993). "Contracts of insurance should receive a practical, reasonable and fair interpretation consonant with the apparent object and intent of the parties in the light of their general object and purpose." *Id.*

"The initial determination of whether a contract is ambiguous rests with the court, and when a contract is unambiguous, is construction is a question of law for the court." *Hartford Fire Ins. Co. v. Carolina Cas. Ins. Co.*, 52 Ark. App. 35, 39-40, 914 S.W.2d 324, 326 (1996). "Ambiguous provisions are to be construed most strongly against the insurer, which drafts the policy." *Home Indem. Co. v. City of Marianna*, 291 Ark. 610, 616, 727 S.W.2d 375, 378 (1987). "However, when the terms of an insurance contract are not ambiguous, it is unnecessary to resort to the rules of construction, and the policy will not be interpreted to bind the insurer to a risk which it plainly excluded and for which it was not paid." *Hartford Fire Ins. Co.*, 52 Ark. App. at 40, 914 S.W.2d at 326. When "only one reasonable interpretation is possible, it is the duty of the courts to give effect the plain wording of the policy." *Foster*, 71 Ark. App. at 133, 27 S.W.3d at 465 (citing *W. World Ins. Co. v. Branch*, 332 Ark. 427, 965 S.W.2d 760 (1998)).

When an insurer's duty to defend is in dispute, the pleadings against an insured generally

determine the insurer's duty to defend.  *Madden v. Cont'l Cas. Co.*, 53 Ark. App. 250, 254, 922 S.W.2d 731, 734 (1996).  "The duty to defend is broader than the duty to pay damages and the duty to defend arises where there is a possibility that the injury or damage may fall within the policy coverage."  *Id.* (citing *Commercial Union Ins. Co. of Am. v. Henshall*, 262 Ark. 117, 553 S.W.2d 274 (1977)).  "It is the allegations made against the insured, however groundless, false, or fraudulent such allegations may be, that determine the duty of the insurer to defend the litigation against its insured."  *Id.* (citing *Equity Mut. Ins. Co. v. S. Ice Co.*, 232 Ark. 41, 334 S.W.2d 688 (1960)).  Although a court must resolve any doubt in favor of the insured in determining whether a complaint states a claim within the policy coverage, *Murphy Oil USA, Inc. v. Unigard Sec. Ins. Co.*, 347 Ark. 167, 178, 61 S.W.3d 807, 814 (2001), courts "are not required by the rules of contractual construction to stretch our imaginations to create coverage where none exists," *Pate v. U.S. Fid. & Guar. Co.*, 14 Ark. App. 133, 136, 685 S.W.2d 530, 532 (1985).

### IV.

Continental argues that the exclusion for claims arising from dishonest or fraudulent acts applies here.  Count II of Bomar's second amended complaint alleges:

> Defendants were negligent in telling plaintiff that they had a client who was investing money in Scanning Technologies, were negligent in failing to advise plaintiff that it was defendants who were investing monies in Scanning Technologies, were negligent in failing to fully disclose that they were investing money in Scanning Technologies, were negligent in failing to advise plaintiff that they had a conflict of interests, and were negligent in blocking the sale of the company.

As a general rule, the pleadings against an insured determine the insurer's duty to defend.  *Madden v. Cont'l Cas. Co.*, 53 Ark. App. at 254, 922 S.W.2d at 734.  The inquiry does not end here, however, as the cause of action must be determined by looking at the "quality and purpose"

of the complaint as a whole, not simply by the use of a word such as "negligence." *See Fisher v. Travelers Indem. Co.*, 240 Ark. 273, 398 S.W.2d 892 (1966). *Fisher* involved a suit arising from a physical attack by an insured upon another man. *Id*. at 273-74, 398 S.W.2d at 892-93. The man who had been attacked alleged in his complaint that the insured "did willfully, unlawfully, and negligently injure [him]." *Id*. at 274-74, 398 S.W.2d at 893. The insured argued that, because the word "negligently" appeared in the complaint, his insurance company had a duty to defend him under a policy providing coverage for injuries "caused by accident." *Id*. at 275, 398 S.W.2d at 893. However, the court held that the character of the liability was to be "determined by the quality and purpose of the transaction as a whole." *Id*. (quoting *Messersmith v. Am. Fid. Co.*, 232 N.Y. 161, 133 N.E. 432, 19 A.L.R. 876 (1921)). The injured party obviously "was not seeking damage for injuries to himself caused by an accident or negligence;" rather, he sought "both compensatory and punitive damages for an alleged willful and intentional act." *Id*. at 276, 398 S.W.2d at 894. Thus, the court in *Fisher* held, "[i]t is evident that the nature of this tort action was not changed by the use of the word 'negligently' one time." *Id*. at 275, 398 S.W.2d at 893-94. *See also Carolina Cas. Ins. Co. v. Pinnacol Assurance*, 425 F.3d 921, 929 (10th Cir. 2005) ("The facts alleged in a complaint, not the complaint's legal characterization of those facts, ordinarily control coverage."); *Standard Fire Ins. Co. v. Proctor*, 286 F. Supp. 2d 567, 572 (D. Md. 2003) (the "mere allegation of negligence is not sufficient to establish [an insurer's] duty to defend;" rather, "it is the substance of the underlying claim, not its label, that controls in duty-to-defend and coverage cases"). "To hold otherwise would be contrary to the plain provisions of the policy," which provided that an "assault and battery" would not be deemed an "accident" if committed by the insured. *Fisher*, 240 Ark. at 275, 398 S.W.2d at 893.

Although Bomar's complaint uses the term "negligence," the real character of the tort alleged in this case is intentional misrepresentation.  *Cf. Cherepski v. Walker*, 323 Ark. 43, 55, 913 S.W.2d 761, 767 (1996) (court looks to the real character of the claim, not the label placed on it by the plaintiff).  Bomar's complaint alleges dishonest and fraudulent acts and omissions, not a failure to exercise reasonable care.  Coverage is not created under the professional liability insurance policies merely because the complaint labels the claim as "negligence" when the facts alleged constitute dishonest and fraudulent conduct.  *See Standard Fire Ins. Co.*, 286 F. Supp. 2d at 571-72.  Section IV.A excludes any claim arising out of any dishonest or fraudulent act or omission by an insured.  All of Bomar's claims arise out of allegations of dishonest acts or omissions by Moser and Jewell.  Section IV.A unambiguously excludes coverage for Bomar's claims.

## V.

The policies issued to Jewell and Moser both contained a section labeled IV.F, providing that no coverage would be available for:

> any **claim** based on or arising out of an **Insured's** capacity as:
> 1. a former, existing or prospective officer, director, shareholder, partner or manager of a business enterprise or charitable organization . . . ; or
> 2. a former, existing or prospective officer, director, shareholder, partner manager, or trustee of a fund or trust which is a pension, welfare, profit-sharing, mutual or investment fund or trust[.]

Both policies also contained a section labeled IV.H, barring coverage for:

> any **claim** based on or arising out of **legal services** performed for any existing or prospective partnership, trust, organization, corporation, company or other business enterprise . . . if at the time of the act or omission giving rise to such **claim**:
> 1. any **Insured** or **Insured's** spouse controlled, operated or managed or intended to control, operate or manage such enterprise; or

9

      2.      any Insured was or was intended to become
           a.      a partner or employee of such enterprise, or
           b.      more than a 10% shareholder or a sole proprietor of such enterprise, or
      3.      **Insureds** cumulatively were or were intended to become more than a 10% shareholder of such enterprise[.]

This case is similar to *Continental Casualty Company v. Smith*, 243 F. Supp. 2d 576 (E.D. La. 2003), which involved a coverage dispute under a lawyers professional liability policy with language identical to sections IV.F and IV.H of the policies in this case. The plaintiff in the underlying lawsuit in *Smith* sued his former attorney and the attorney's law firm, alleging that the attorney had unlawfully taken control of corporations that were owned in part by the plaintiff. *Id.* at 577-78. The attorney had represented both the corporations and the plaintiff, who was then the president of the corporations. *Id.* The plaintiff alleged that he and the attorney agreed that the attorney would take over as president and that the plaintiff would move into a newly-created CEO position. *Id.* Upon becoming president, however, the attorney allegedly succeeded in taking control of the corporations and firing the plaintiff because the attorney had never amended the corporate by-laws to include the CEO position. *Id.* at 578. The plaintiff filed suit in federal court, alleging, among other things, RICO violations, legal malpractice, breach of fiduciary duties, and fraud. *Id.*

The court in *Smith* held that sections IV.F and IV.H of the insurance policy were "clear and unambiguous." *Id.* at 581. The court then determined that the attorney and his firm were not entitled to either a defense or indemnification under the policy because all of the plaintiff's allegations arose out of the attorney's "activities as president of the corporations, in anticipation of his role as president, or from legal services performed for companies that an insured managed,

controlled or intended to control." *Id.* at 582. The defendants in *Smith* "failed to identify a single allegation in the Complaint . . . that state[d] a cognizable claim independent and separable from an insured's capacity as an existing or prospective officer of the corporations or from legal representation provided to companies which an insured controlled or intended to control." *Id.*

The undisputed facts are that Jewell and Moser controlled Scanning Technologies's financial transactions, funded its operations, determined Bomar's compensation as president of Scanning Technologies, and conducted negotiations for the potential sale of the corporation. Jewell and Moser controlled Scanning Technologies. Bomar's claims arise out of services performed for Scanning Technologies. Section IV.H of the policy excludes claims from coverage. The defendants in this case, like the defendants in *Smith*, point to no claims arising out of any other activities that could be subject to coverage under the policies.

Because Sections IV.A and IV.H unambiguously exclude coverage, the court need not and will not address the other grounds for summary judgment asserted by Continental.

## CONCLUSION

As a matter of law, Continental has no duty to defend or indemnify Bobby Keith Moser, Moser & Associates, P.A., Barry Jewell, or Jewell Law Firm, P.A., against the claims asserted by Bob Bomar. Continental's motion for summary judgment (Document #28) is therefore GRANTED.

IT IS SO ORDERED this 29th day of March, 2006.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

11